[No. D059706. Fourth Dist., Div. One. Dec. 22, 2011.]

In re A.S., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
MARY M. et al., Defendants and Appellants.

## COUNSEL

Cristina Gabrielidis-Lechman, under appointment by the Court of Appeal, for Defendant and Appellant Paul S.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant Mary M.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Gary Seiser, Deputy County Counsel, for Plaintiff and Respondent.

Terence M. Chucas, under appointment by the Court of Appeal, for Minor.

**OPINION**

**McCONNELL, P. J.**—Mary M. and Paul S. appeal the juvenile court's jurisdiction and disposition findings under Welfare and Institutions Code section 300, subdivision (b).[1] They challenge the sufficiency of the evidence to show their daughter, A.S., was at substantial risk of harm, and that removal from the home was the only reasonable means of protecting her. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Because of the parents' work schedules, they left A.S. at the home of the paternal grandfather (the grandfather) and the paternal great-aunt (the aunt) between Tuesdays and Thursdays. On a Wednesday in March 2011, the grandfather, who had been home alone with eight-month-old A.S., took her to a hospital. When she arrived, she was limp, pale, and nonresponsive. CPR was administered and she was transferred to Rady Children's Hospital, where testing "showed presence of a right subdural hematoma which was mixed density, acute or acute and chronic," and bilateral retinal hemorrhages "most consistent with subacute."

The parents told the attending physician, Marilyn Kaufhold, that A.S. was healthy when they left her with the grandfather the previous day and they were unaware of any traumatic event. The parents reported that the grandfather told them he walked away from A.S. when she was lying down drinking a bottle. He heard her begin to choke and returned to her, finding her limp.

The San Diego County Health and Human Services Agency (the Agency) took A.S. into protective custody and filed a petition on her behalf under section 300, subdivision (b).[2] The petition alleges that A.S.'s injuries "would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of the parents of the child and there is substantial risk that the child will suffer serious physical harm or illness." (See § 355.1, subd. (a).)

---

[1] Further undesignated statutory references are also to the Welfare and Institutions Code.

[2] Section 300, subdivision (b) applies when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b).)

The Agency's report for the detention hearing notes that none of the caretakers had an explanation as to a possible cause of the injury. The grandfather denied dropping A.S. or that she fell. He said he was attentive to her and watched her closely. The aunt reported that when the parents delivered A.S. the previous day, she was breathing through her mouth. The aunt spoke to the parents about calling a doctor, but instead Mary left a suction device with the aunt and she and the grandfather removed mucus from A.S.'s nose a few times. The aunt denied that she or the grandfather ever got frustrated or angry with A.S.

The parents denied that A.S. had a cold or any difficulty breathing the day before the incident. Paul denied ever seeing the grandfather lose patience with A.S. Mary reported that the grandfather took good care of A.S. and they were bonded. Mary said Paul was attentive to A.S., but at times he got frustrated with her and yelled her name before calming down.

Dr. Kaufhold advised the Agency that A.S.'s "injury was not sustained by falling and is consistent with being shaken or a slam to a soft surface." Dr. Kaufhold considered A.S.'s injury nonaccidental because none of the caretakers had any explanation for it. As to the timing, Dr. Kaufhold advised that she "cannot give an exact time or date." She stated that while A.S.'s symptoms were "classic to the injury just [having] occurr[ed]," the injury "could have been as old as one week."

Dr. Kaufhold issued a report, which states: "Inflicted trauma is strongly associated with [A.S.'s] findings. These findings are most often caused by rapid acceleration and deceleration, beyond any activity involved in the normal care of a child." The report also states test results from the hospital that first treated A.S. "showed no xanthochromia which would be consistent with a more recent event." The report does not, however, rule out the possibility the injury occurred when A.S. was in her parents' care.

The Agency's report for the joint jurisdiction and disposition hearing notes there was still no information on a possible cause of A.S.'s injury. The hearing proceeded on this report and the Agency's report for the detention hearing. The parents offered no evidence.

The court disagreed with Dr. Kaufhold's expert opinion as to the nonaccidental nature of A.S.'s injury. The court offered its personal opinions on the matter. For instance, the court stated "an acute subdural hematoma, that's only on one side of the head, is exactly the sort of thing that could result from a fall, in my limited knowledge." The court added: "[W]ith respect to the evidence that . . . [k]ids don't ordinarily wind up with this unless somebody shook them or was otherwise rough with them, . . . that it cannot

be from some other source is unsupported by the evidence. It's just a conclusion." The court also stated, "Dr. [Kaufhold] just isn't up to date on her physics. Because to say that you couldn't drop a child and have the same sort of deceleration when the child's head hits the ground as would be apparent in a shaking, I'd need—I need some calculations to prove that. And I don't think it's possible without bruises, unless they—unless somebody, you know, wrapped the child in cotton." The court also stated, "There is one way it can happen without trauma, and that's an infant stroke, which often mimics these symptoms. It's very rare, and there has not been a workup to determine if that's possible."

The court nonetheless sustained the petition, finding "by clear and convincing evidence that it is appropriate to remove the child from the home at this point because of the lack of an explanation as to how this happened." It explained, "[I]f I were to accept the fact, and I will at this point, that an accident is the same thing as neglect, and for the purposes of this hearing, I will, I think it's sufficient." The court removed A.S. from parental custody and ordered liberal supervised visitation and voluntary services for the parents.

## DISCUSSION

### I

*Inapplicability of Section 355.1, Subdivision (a)*

Preliminarily, we address the Agency's assertion it brought the petition under section 300, subdivision (b) *and* section 355.1, subdivision (a). Section 355.1, subdivision (a) applies when competent professional evidence shows the child suffered an injury of the type that would not ordinarily be sustained absent the unreasonable or neglectful acts or omissions of a parent, guardian, or other person who has the care of the child. Such evidence is prima facie evidence the child is a person described by section 300, subdivision (a), (b), or (d). (§ 355.1, subd. (a).)

Section 355.1, subdivision (a) raises a rebuttable presumption affecting the production of evidence. (§ 355.1, subd. (c).) "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604; see *In re James B.* (1985) 166 Cal.App.3d 934, 937 [212 Cal.Rptr. 778] [discussing former § 355.2, § 355.1's predecessor].) Section 355.1,

subdivision (a) "shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home." (*In re James B., supra*, at p. 937, fn. 2, italics added.) If the parents raise rebuttal evidence, the Agency maintains the burden of proving the alleged facts. (*Ibid.*)

The Agency asserts the court properly sustained the petition because it presented a prima facie case, and the parents did not meet their burden of producing evidence indicating that A.S. is not a child defined by subdivision (b) of section 300 because neither they nor the other caretakers caused A.S.'s injuries. The Agency's petition, however, does not cite section 355.1. It cites only section 300, subdivision (b). Further, contrary to the Agency's theory on appeal, the petition does not allege the possibility that a person other than the parents may have inflicted A.S.'s injuries. At the detention hearing, the Agency did cursorily say it was "asking for a prima facie finding." At the jurisdiction and disposition hearing, however, the Agency did not mention section 355.1, subdivision (a) or argue that any rebuttable presumption arose under which parents had the burden of production. Additionally, the court did not address section 355.1, subdivision (a) or make any threshold finding. (See *In re Sheila B.* (1993) 19 Cal.App.4th 187, 200, fn. 7 [23 Cal.Rptr.2d 482] ["Since the juvenile court never made the finding required by this section, this presumption never came into play."].)

We conclude the Agency has forfeited the matter by not giving the parents and the court sufficient notice of its reliance on section 355.1, subdivision (a). When the Agency intends to rely on the statute to shift the burden of production to the parents to show that neither they *nor other caretakers* caused the child's injuries, it must do so in a clear-cut manner. It should, of course, cite section 355.1, subdivision (a) in the petition along with the applicable subdivision of section 300. (See, e.g., *In re James B., supra*, 166 Cal.App.3d at pp. 936–937.)[3]

## II[4]

### *Substantial Evidence Supports the Court's Jurisdictional Finding*

#### A

■ " 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the

---

[3] Mary's opening brief states, "in attempting to prove neglect, the Agency relied upon the statutory presumption created by section 355.1, subdivision (a)." Paul, however, does not indicate he had notice. Both parents assert the statute is inapplicable because the court made no finding under it.

[4] A.S.'s appointed appellate counsel agrees with the Agency's positions on the merits.

minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645 [271 Cal.Rptr. 319].) " 'The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction.' " (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379 [97 Cal.Rptr.2d 746].) "The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134 [106 Cal.Rptr.2d 465].)

"Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 823 [2 Cal.Rptr.2d 429].) When section 355.1, subdivision (a) is inapplicable, as here, the Agency must show by a preponderance of the evidence that the child is a person described by section 300. (§ 355, subd. (a).)

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.] The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433 [95 Cal.Rptr.3d 235].) "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [82 Cal.Rptr.2d 426].)

B

The parents contend A.S.'s injuries were either accidental or the grandfather caused them. They assert the evidence is insufficient to show A.S. is a dependent child within the meaning of section 300, subdivision (b), because the Agency failed to prove *they* neglected or inadequately supervised A.S., or that they had reason to suspect she may be in danger at the home of the grandfather and the aunt.

The evidence, however, amply supports a finding the injuries were inflicted intentionally. A.S. suffered a subdural hematoma and bilateral retinal hemorrhages, and Dr. Kaufhold reported that these injuries do not ordinarily occur accidentally. In her opinion, the injuries were "caused by rapid acceleration and deceleration, beyond any activity involved in the normal care of a child." Further, she found the "injury was not sustained by falling and is consistent with being shaken or a slam to a soft surface."

Paul now attempts to refute Dr. Kaufhold's opinion by citing Web sites on subdural hematomas in children. He claims the "[u]nintentional trauma here could have included a car[] accident or sudden braking in a car, where [A.S.] suffered a whiplash-type event." This information is not properly before us because it was not presented to the juvenile court. (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1251, fn. 4 [95 Cal.Rptr.3d 273].) Without any supporting evidence, Paul's theory is sheer speculation.[5] Further, if A.S. had been in a car accident the parents, the grandfather, or the aunt would presumably have known about it and reported it to the hospital and the Agency as a possible source of the trauma. To the contrary, an Agency report notes that while Dr. Kaufhold told the Agency that a car accident may cause a subdural hematoma, A.S. "has not been in a car accident."

The parents assert that when the cause of the injuries is unknown, the possibility that one or both parents may have been involved is insufficient for a jurisdictional finding under section 300, subdivision (b). The conclusive identity of the perpetrator, however, is not a prerequisite of jurisdiction. (See, e.g., *In re Christina T.* (1986) 184 Cal.App.3d 630, 640 [229 Cal.Rptr. 247] [jurisdiction under subds. (a) & (d) of § 300 was proper when it could not be conclusively determined whether the father or the mother's boyfriend sexually abused the child]; *In re E. H.* (2003) 108 Cal.App.4th 659, 670 [133 Cal.Rptr.2d 740] ["where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out"].) "Unlike criminal proceedings, where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings [is] to fashion appropriate orders in the best interests of the child . . . ." (*In re E. H., supra,* at pp. 668–669.) If a perpetrator's identity must be conclusively established, "a family could stonewall the [social services department] and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding . . . ." (*Id.* at p. 670.) The prerequisite of a conclusive identification could lead to absurd results: the potential return of a seriously injured child to an unidentified perpetrator. The purpose of dependency law "is to provide

---

[5] Paul asserts one of the Web sites shows "that nearly one fifth of infant and toddler subdural hematomas resulted from unintentional trauma." Ergo, the great majority of such injuries are inflicted intentionally.

maximum safety and protection" for currently abused and neglected children and to ensure the safety of children at risk of harm. (§ 300.2.)

At the time of the jurisdiction hearing, the parents could not be ruled out as perpetrators. In Dr. Kaufhold's opinion, A.S.'s injuries could have been inflicted recently or up to a week before A.S. was taken to the hospital, a period during which the parents, the grandfather and the aunt all cared for her. The evidence supports a reasonable inference that one of the caretakers injured her, and concomitantly, a reasonable inference that A.S. was at substantial risk of serious physical harm, even life-threatening harm, in the parents' home as a result of their failure or inability to adequately protect her. (§ 300, subd. (b).) The risk of harm was actual, and not speculative as the parents claim.

The parents concentrate on the court's stated reasons for exercising jurisdiction. They contend the court erred by equating an accidental injury with neglect for purposes of jurisdiction under section 300, subdivision (b). Mary cites *Jordy v. County of Humboldt* (1992) 11 Cal.App.4th 735 [14 Cal.Rptr.2d 553], which observes: "Whatever the scope of the protection intended by the juvenile court law, it does not extend to every isolated lapse of parental judgment which a jury may in retrospect find negligent. No one would suggest a child could be taken from its parent where the parent, in an isolated lapse, failed to prevent the child from darting into the street, or failed to provide adequate training in the use of roller skates, or left a ladder leaning in a place where the child might find it." (*Id.* at pp. 743–744.)

We agree the court's reasoning was faulty and it overstepped its role. In assessing the evidence in light of the clear and convincing standard, the court could not arbitrarily reject Dr. Kaufhold's uncontradicted opinion on the nonaccidental nature of A.S.'s injuries in favor of its own unsupported lay views on subdural hematomas in children. However, " '[w]e uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review." ' " (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876 [7 Cal.Rptr.2d 277].) Substantial evidence supports the exercise of jurisdiction under subdivision (b) of section 300 given the nonaccidental and serious nature of A.S.'s injuries, and the ruling was in her best interests. We will not tamper with it based merely on the court's gratuitous comments.

## III

### *Substantial Evidence Supports the Court's Dispositional Finding*

■ The parents also challenge the sufficiency of the evidence to support the court's dispositional order. "After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169 [127 Cal.Rptr.3d 424].) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*Id.* at pp. 169–170.)

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M., supra*, 197 Cal.App.4th at p. 170.)

The parents emphasize the nature of the juvenile court's "clear and convincing" test. As this court has explained, however, " 'on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . .' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 [114 Cal.Rptr.2d 499], fn. omitted.)

As with the jurisdiction finding, the evidence amply supports the disposition finding. As the court explained, "it is appropriate to remove the child from the home at this point because of the lack of an explanation as to how this happened." The Agency's medical evidence showed a possibility that A.S. was injured up to a week before she was taken to the hospital, and during that period she was in the parents' care as well as the grandfather's and the aunt's care. As the Agency points out, "the court realized that in the absence of an explanation leaving the child with the parents was just as risky as leaving the child with the grandfather and [the aunt]." The notion that the

court was required to return A.S. home at the disposition stage when the medical evidence did not *prove* she was in her parents' custody when she was injured is mistaken.

Further, the evidence that A.S. may have been in the parents' care when she was injured supports the court's finding that "[r]easonable efforts were made to prevent or eliminate the need for the removal of the child from the home." (See § 361, subd. (d).) Mary asserts that "[f]requent, unannounced home visits were a real possibility and an alternative to removal," and, an "order placing [A.S.] at home with her parents under strict supervision of the juvenile court and the Agency, with court-ordered services in place, would have been a perfectly reasonable means of protecting [A.S.] without removing her from her immediate family." Paul joins in this argument. However, given the severity of A.S.'s injury, and her young age and defenselessness, we cannot fault the court for rejecting such alternatives. (See *In re Rocco M., supra*, 1 Cal.App.4th at p. 824.)[6]

## DISPOSITION

The judgment is affirmed.

Nares, J., and McIntyre, J., concurred.

---

[6] Paul's reliance on *In re Jeannette S.* (1979) 94 Cal.App.3d 52 [156 Cal.Rptr. 262], for the assertion the court should have kept A.S. in the home under court supervision, is misplaced as the dependency there was based on the filthy condition of the mother's home rather than on a severe physical injury. (*Id.* at pp. 56–57, 59–60.)